Good morning, Your Honors. Nicholas Nelson of the Upper Midwest Law Center for the Plaintiff Appellant, Dr. Scott Jensen. May it please the Court. When the government threatens to take away your livelihood just because you criticized it, that is an egregious violation of the First Amendment. And when the government repeatedly does that to a major political candidate during the campaign about criticisms that are his signature campaign issue, of course, it's extremely plausible that this will chill the candidate's speech, both during the campaign and after it. That by itself would require reversal of the judgment below. But the interest of justice strongly suggests that the Court additionally address at least the issues of qualified immunity. We're here on standing. That's right, Your Honor. The parties have briefed other issues. The State raised several merits issues as alternative grounds for reversal. We agree that it would be in the interest of justice for the Court to decide those, partly because... On what basis? On what jurisdictional basis? Well, the State's offering them as alternative grounds for affirmance, and we're suggesting that the Court reject those. Did they cross appeal? They did not. Well, then it's gone. You don't cross appeal. You can't expand a decision to your advantage. They're asking that the decision be affirmed on these bases. So they're asking for the same results that Judge Blackwell entered below for different reasons, and we're suggesting that it would be in the interest of justice for the Court to reject those reasons rather than sending it back for another round of motion to dismiss briefing before Judge Blackwell. The reasons are this is an important case. It's been going for a long... Yeah, the reasons are we don't want to have to bother to play by the rules. We want the Court to decide this separation of powers issue. What's new? Very well. Well, I mean... I've grown up and been taught by the Supreme Court we don't do that. We pay attention to Article III limitations. So if the Court wishes to reverse simply on standing and have additional briefing on motions to dismiss below, that's fine with us? Well, other than you want us to do it, what basis is there to do it? Alternate... I think it's fairly common, Your Honor, that when a district court enters a judgment and then one side appeals, right, the other side tries to defend the appeal by saying, hey, there are these other reasons why the district court should have entered the same judgment. And on what percentage of those occasions when the district court didn't address it do we take it up? You know, like that? I think that's right. I think it's relatively rare. I think the Court can do it. I think that's well established, and I think this is a good case to do it. Partly just because it's been a long time in the district court. This is about a case that affected the 2022 election here in Minnesota. It was filed in 2023. Here we are in 2026, and in this really important First Amendment case, we haven't gotten past the pleading stage. You know, we've had two dismissals on the pleadings in the district court. If it goes back for another round of motion to dismiss briefing, it's looking like it could be possibly a decade before Dr. Jensen has the chance to vindicate his First Amendment rights. I don't think that's appropriate. But, you know... Don't we have to change the disposition at least a little bit to achieve that? Because my understanding is on the standing it was a dismissal for lack of jurisdiction, whereas going to merits would be a dismissal, you know, or rejecting a dismissal for failure to state a claim. So those seem to me to be different things. So is there sort of a different disposition barrier? And this may be more for the other side, but doesn't that present a problem? I think I better direct that question to the other side because I'm not sure what the answer is to be honest. But I think that if that's the case, then okay, fine. You know, we go back and we do it again below. You know, again, I think the reasons for, you know, moving this case along are pretty weighty. So if it can be done, I think it should be done. To speak to those issues, if I may, you know, on qualified immunity, I think that the Supreme Court's NIFLA v. Becerra decision is dispositive. I think if you give that opinion to 100 law students and ask them, do professional licensure requirements give the government special authority over political speech by doctors, all 100 students are going to say no, and no reasonable government official could think otherwise. You know, if the government has any authority over professional speech, it ends at the boundaries of the professional relationship itself. It covers at most only speech where a doctor is speaking within or proposing a doctor-patient relationship. What about if, and this is in these facts, but what, suppose Dr. Jensen was speaking in front of a whole auditorium full of doctors, medical professionals, and others, and made some of these same statements. So it's not political. This is a professional conference. What do we do in sort of one of those hybrid situations, do you think? Yeah, so maybe a little bit harder than this case. I think it's still pretty clearly that's on the protected side of the line. You know, this court's decision in Young v. Ricketts from 2016, it's 825 F. 3rd at 494, says that the language there is, looks for a personal nexus between professional and client. Whether a speaker is purporting to be exercised in judgment on behalf of any particular individual. So if you're just talking to a conference, to whatever, you know, even if it's a professional environment, it's not a professional relationship. And I think that's the key. I think it's important that that be the key, right? I mean, we don't want government to have the ability to, you know, when there's a major controversy, to use licensing requirements to silence the voices that know the most about the topics at issue, right? I mean, if this were the case, then, you know, when there's a medical controversy, only doctors who agree with the government would speak about it. When there's a legal controversy, only lawyers who agree with the government would speak about it. And you can go on and on. Here in Minnesota, maybe we would want accountants to be talking about some of our, you know, current political issues. And we want them to be able to criticize the government as well as support it. And construing licensure authority broadly in a way that the Supreme Court hasn't, and this Court hasn't, would prevent that. So I don't think we want to do that. Also with respect to our facial overbreath challenge, you know, I would just point out the core statute that's at issue in this case, with respect to our facial challenge at least, is Minnesota Statutes 147.091, Subdivision 1G1. And that purports to bar doctors from, quote, conduct likely to deceive or defraud the public. The defendants have construed that to mean that it covers any speech by a doctor to the public that the defendants disagree with. I think that's, you know, as we've just discussed, that sweeps in a ton of speech that is way outside any authority that the government has to regulate. So I think those unconstitutional applications vastly exceed any legitimate sweep that it may have to... The only thing it has to have is one legitimate. Well, not in a First Amendment facial overbreath challenge. I mean, there the standard is... That debate goes way back. Fair enough. And I mean, I agree with the standard you're articulating, Judge Lopen, outside the First Amendment context, right? The facial challenge, if there's one, you got to prove every application is unconstitutional. First Amendment, I think it's pretty well  established, you know... It's not pretty well established. I mean, the Supreme Court has gone 5-4, 4-5, 6-3 and so forth on that issue. All right. Well, if you agree with the five who sometimes vote for this rule, facial overbreath, you know, do the unconstitutional applications outweigh the plainly legitimate sweep? I mean, that's the language from the decisions that we're relying on. You know, I think there are a lot of cases, and they're not coming to my mind right now, but I think there are cases where this Court has applied that standard and struck down things that, well, you know, maybe it would be... And not. I'm sorry? And have not. Right. Yeah. I mean, I don't think... Almost within two years of each other. Right. So, and we have, as applied, and facial challenges here. So, you know, this is about a doctor who, you know, went on TV running for governor and was told by the government, you know, we don't like what you said in that TV interview. We don't like what you said in that social media post as part of your campaign. We're looking at taking away your livelihood because of that. So that's the as applied challenge. I think it's the strongest as applied First Amendment challenge that this Court is ever likely to see. It is the most paradigm First Amendment violation you can really think of. The government telling someone who's running for office, hey, you're saying the government's doing a bad job. We don't think you should be able to be a doctor anymore. If there's anything that the First Amendment... Now, what do you do... I want to ask about over-breath in another respect, which is the Josephine Havlak photographer case, which is on the standing side. And it prescribes what you're supposed to have to have standing for an over-breath challenge. I just want to ask the question, how do you satisfy that for standing grounds? Yeah. So, I mean, in terms of just taking that on its terms, and there's questions about that case, I think. But taking it on its terms, we've explained lots of ways why this might apply to people differently from Dr. Jensen. It covers any speech on any topic by a doctor that's in public that the defendants don't agree with. So if we have to identify... I mean, the Havlak opinion uses the term evidence, but I can't see how you would have to provide evidence at the pleading stage. I mean, that would be a summary judgment thing, even if that's the law. So we've identified, we've talked about these potential other applications. We've listed all kinds of topics in our briefs about, look, this could cover speech about food dyes or abortion or Medicare or whatever. I think that has to be enough at this stage. What do you do, though? I mean, one of the things that struck me is you're right, you do come up with hypotheticals. But on Dr. Zajac, it's almost someone who's very similar factually to Jensen. They not both were running for governor, but they were saying similar things about COVID. Is that enough to find somebody who's pretty similar that's also affected by it, to bring a facial overbreath challenge under that case? One of the questions about Havlak is, well, how different does it have to be, right? I mean, how do you measure whether it's different? So, I mean, I think the best way to understand the Havlak opinion is just as saying, hey, if the as-applied challenge is really just the same as the facial challenge, right? If striking the law down as to this person is basically going to cover it as a matter of precedent for everybody else, then as a prudential matter, it's really not important to decide the facial challenge. I think here we've explained why, you know what, there's a lot going on that ruling in favor of Dr. Jensen might not clarify, well, what if it's a senator race, right? What if it's a speech about a different topic? What about your audience hall hypothetical? Things like that. If I may, I'd like to reserve the balance of my time for rebuttal. Thank you, Your Honors. Mr. Lienish. Good morning. May it please the Court, Counsel, my name is Nicholas Lienish. As an Attorney General, and I represent appellees in this matter. Between April of 2020 and June 2022, the Board of Medical Practice received 18 complaints regarding appellant, a doctor licensed by the Board. The Board is required by Minnesota law to receive and resolve complaints against its licensees, and staff follow standard procedures to determine the facts behind the complaints. As part of that investigation, appellant received four letters of inquiry asking about the circumstances described in the complaints. He attended one investigative conference with the Board's Complaint Review Committee, after which all 18 complaints were dismissed with no disciplinary or corrective action taken upon appellant's license. Why isn't that an injury? If you have some sort of, you know, threat of enforce, actual enforcement brought against you, or potential enforcement, and say you have to hire a lawyer or you have to make photocopies for it, why isn't that a monetary injury? I don't get it. Well, Your Honor, those are the requirements that apply to licensees of the Board of Medical Practice, and there are similar requirements that apply to all licensees in the State of Minnesota and many other states. That doesn't answer the question. Because, just because it's required by law doesn't mean you don't have an injury from the law. Well, in this case, the record reflects that there were four inquiry letters, which are standard letters required. As the Board is required to receive and resolve complaints, sending a letter of inquiry is explicitly enumerated in the statute as one of the investigative tools that the Board can use. Therefore, the Board can't control what complaints it receives. In this case, it received 18 complaints, followed the law in sending the letters. Like your brief, you're just addressing merits. You're not addressing standing and injury. Yeah, and I want to press you. I'm not saying the Board's doing anything wrong, necessarily. We're not there yet. I mean, I know you want us to decide that. But what I'm saying is, if you start an investigation and somebody suffers a monetary harm because of that, whether the investigation is justified or not, I just, for the life of me, I can't figure out how that's not an injury under Article III. Your Honor, I just don't think that complying with the structure of the Board's licensing The best case in response to Judge Strauss? Well, I think the best cases are the standard injury, in fact, line of... One case that addresses his question. I could not find a case, Your Honor, that applied to a regulatory arena. And I think that's important in this case because we have a licensee who agreed to, applied for, and held a license with the Board. It's a privilege to practice medicine in Minnesota. It's a And as part of that privilege, you have responsibilities that include cooperation. Actual injury for a licensee, for anybody. Actual injury gets the lawsuit in the front door. Again... Then we go on from there. Again, Your Honor, there was no action, corrective or disciplinary, taken against this licensee. He just told you. There's monetary injury, to say nothing of chilled speech and so forth, all over the place here. Well, the Board can't control how its licensees respond to its inquiry letters. If a licensee chooses to be represented by counsel, that's certainly their option. If they choose to respond to a letter in 30 minutes, they can certainly do that as well. In this case, the Board sent only four inquiry letters in response to 18 different complaints to a licensee. Actual injury doesn't count if you could have done it... You could have just defended your own. Your Honor, the... What case addresses that? Well, Your Honor, again, I think in the licensing context, it's important to look at this case in the context of a licensing regime. For example, in these inquiry letters, as you've seen in the record, they simply quote one or two lines from the complaints. The complaints are often short. The inquiry letters are therefore short, and asked for a response from the licensee to give them... There are all kinds of bar disciplinary cases out there in which First Amendment and other defenses are asserted. There's all kinds of licensing cases that have made it to the Eighth Circuit and elsewhere. You can't get any support from any of those cases for your propositions. That speaks loudly. Your Honor, I'll just note to set the stage here that in the investigation, the appellant received four letters of inquiry about the circumstances and the complaints. He attended one investigative conference with the Board's Complaint Review Committee, after which all 18 complaints were dismissed with no disciplinary or corrective action taken. He makes no allegations of any new complaints or investigations. That'll reduce the damages. I mean, if it's a good claim. But it's a real claim. Just like getting disbarred is a real claim. Well, I'll just note that in this case, the procedural history indicates that the complaint was originally filed in 2023, the amended complaint in April of 2024. Along with the amended complaint, there was no claim of any additional complaints, investigations, actions by the Board. Do you agree just, I mean, factually, do you agree? Is there any reason for you to doubt at this stage that Mr. Jensen incurred some costs in trying to defend the actions in terms of whatever, photocopies, time, maybe counsel, that those are all legitimate costs? Well, I think it's certainly part of the record that he responded to the allegations that were in the complaint that the Board sent. And I think it stands to reason that it took, you know, some degree of time. However, again, that time was all part of his responsibility as a licensee of the Board and part of standard Board investigative procedures, responding, sending letters of inquiry, and then a licensee responding to them. Okay. But I don't know that you answered my question. I mean, is there any reason to doubt that he had those expenses or that he took the time that he purports to have taken on it? Well, I think we need to take, at this stage, in this posture, we need to take the allegations in his complaint as true. Okay. So, in this case, the Board followed proper sedatory process and no action was taken against the appellant's license. Appellant is not entitled to damages and other relief against the Board and its members and staff. I'd like to focus mainly on the issue of standing. The two main issues here with regards to standing are, first, appellant's failure to adequately plead injury, and second, his failures to plead causation. I'm going to jump because we've already talked about one of them. We've talked about the monetary injuries, but chilling. So, Henderson, our en banc case, came out pretty recently, and I think it may have something to say about chilling injuries. From the Board's point of view, how does Henderson affect your case? Well, the Board's position is that, based on the record that's available to it, the record itself indicates that the applicant continued to speak forcefully and publicly about the issues about which he claimed to have been chilled. This is Rule 12, right? Correct. So, we have no record. Well... You have a complaint. An admitted complaint with attachments. It includes all of the complaints that were filed, all 18 complaints. You'll see throughout, this was from April 2020 to June of 2022, and all of the complaints indicate concerns about the public health implications of the appellant continuing to speak. So, we can see from those complaints that he continued to speak. It includes news articles, items from the internet about speeches that he gave. And so, he clearly continued to speak. And so, that's the Board's concern about claims of a chilling effect, is that when he continues to speak and refuses to provide any specifics about how his speech was chilled, then you have an issue with stamp. Well, let me ask you this. So, I'll just take you to another world. So, you know, coaches, right? Coaches get up after a press conference and they're not supposed to criticize the referees. And so, they say things like, yeah, we had a tough day, but the referees really didn't cause us to, you know, to lose the game. Is that sort of what's happening here, though? Is it possible that that's what's happening here, where Jensen may be going out and saying things about COVID-19, but he's so worried about his medical license that maybe he's saying something a little different. And if he is, is that an injury? Well, I suppose it's possible that he's saying something a little bit different. However, he doesn't allege any information about in what way he may have tailored his speech, in what way it may have been chilled, what these speeches were, what he would have said differently, who the audience was, any of those basic pieces of information. Is that required? And that's my follow-up question. So, if you look at Rule 8, our older cases in particular say that ICBAL, plausibility pleading, applies to claims and the merits. But our older cases say general allegations of injury are enough. So, is it enough then under Rule 8 to say, yeah, you know, I said things that are a little different. Yeah, I gave up some speaking opportunities and things like that. Or are you imposing, do you require more specificity and less conclusions? I don't think that we're applying the wrong standard here. I think what we're saying is that statements that are this general, when there is evidence in the record that the speech was not chilled, that he continued to speak on the same issues, that doesn't meet the standard. So, in your view, and maybe I'm misreading this, he needs to come in and say, the specific, maybe I still ended up speaking or I didn't speak at all, but at the very least, here are the list of five things that I gave up over the course of these two years because I was worried about losing my medical license or getting, I mean, there needs to be more specificity. That's the board's position. That could be an example, Your Honor. This bleeds into compelled speech under Henderson too. What you're basically saying is, oh, well, he tailored it. He was just compelled to give a softer answer or whatever. That plays right into Henderson, the third basis for standing. I don't think this is a compelled speech case, Your Honor. The way you just answered the question suggests it is. I was attempting to speak, Your Honor, more to the pleading standard and answer the judge's regarding what could have been pled differently here. But I'm not compelling... Documents show he continued to speak. And therefore, if he tailored his speech, that doesn't meet the chilling standard in Henderson. I say, well, it sure looks like it meets the compelled speech standard, like the coach. Well, I would just say, Your Honor, that the board is not telling anyone specifically what to say. There's no notices being posted in any clinics in this case. This is very different from NIFLA. The board is not telling people what to say. It's receiving complaints from members of the public, as the record reflects here. But that's past the standing question. There again, nobody can resist going into the merits in this case. Well, again, the complaints are appended to the amended complaint. And I think it's fair to look at the record as set forth the amended complaint and its attachments. And I think that's helpful to see. Because we're seeing that the board is not generating these complaints. It's not dreaming these up. It's getting these 18 complaints from members of the public. Most of them appear to be the people of Minnesota. And it's doing what it's required to do under Minnesota statute, which requires the board to protect the public of Minnesota and trying to investigate those complaints. Sending four inquiry letters for 18 complaints to the licensee in this case. Asking him to respond to allegations. Giving him an opportunity to respond to allegations that were made about him. I haven't looked into the complaints. Identify the person other than name and address. Name and address are redacted. But some of them say, I'm a such and such. Like one says, I'm a pharmacist. One says, I'm from such and such town. You know, that sort of thing. So, for all we know, they all could have been staffers for the election opponent of Dr. Jensen. I encourage you to look at them. I think it would... We know. On this record. It would have to be quite a scheme. They seem clearly to be... Not in the world of politics. All right. Well, I encourage the court to look at them and make your own judgment, of course. Can I ask you one more question about Henderson? So, one of the things that's, I think, a little forgotten, is initially when the training was going on, some of the plaintiffs complained about it. They said, like, we don't like this. Or they said things that, like, they believe. Like, I believe that this training... I believe the opposite of what the right answer is. And then eventually they became muffled. Because they felt like they were going to lose their job. How does that apply here? It kind of feels like we have a similar type of claim being made. Jensen started out by saying sort of what he wanted to say. Then you have the complaints. And he's at least alleging, in line with Henderson, that I changed what I said or muffled myself in some way. Does Henderson help the plaintiff's case just a little bit here? I don't think so, Your Honor. I think the record reflects that he continued to speak forcefully, strongly, give his opinion. It seems to be consistent throughout. And he continues to speak. There were five complaints that were received between April 2020 and May of 2021. The other 18 complaints were received after that. So the bulk of these happened after the board had already sent these inquiry letters. So I don't think the record is reflecting that. I would also note that the appellant claims that he told the board that his speech was being chilled. In fact, he said that one complaint, which the board simply quoted, that complaint was compelling, was chilling his speech. That's not the board's speech. I see that my time is up. Thank you, Your Honors. Thank you, Your Honor. Thank you, Judge Loken. Quick point on changing the relief below. I mean, if the state thinks that we haven't pleaded on the merits well enough, that can be a basis for dismissing without prejudice, just as easily as with prejudice. So they could be just arguing, hey, just, you know, same relief. Don't change it. I think that addresses that point. I know Judge Loken probably wants me to get to standing, so I will. I heard opposing counsel say that there are no cases arising out of the regulatory arena finding standing. I would point to the Susan B. Anthony list versus Dry House case. The Supreme Court's one of their foremost precedents here arose out of the regulatory arena. The Supreme Court had a couple paragraphs in there saying, overwhelmingly suggesting that administrative proceedings can satisfy standing. They did say, technically, we don't have to decide this, but I mean, it's the most overwhelming suggestion that one could think of, really. Just to note, to make sure that it's clear in everyone's minds, I think it is, but this obviously is a facial challenge to standing, whether it's been pleaded in the complaint. There was no effort by anybody to challenge the actual facts or submit evidence in the district court. So that's the universe we're in. And then finally, I want to talk about our pleadings of chill. I think Judge Strauss' analogy to people pulling punches in interviews and saying, I want to speak carefully, that's exactly the kind of thing that we're talking about here. We allege that expressly at several points in the complaint, saying, to date, Dr. Jensen feels like he can't speak carefully. I think it's paragraph 9, paragraph 322. There's probably 10 others in there where it says something like that. So those are express allegations of chill. We also have very specific and concrete facts pleaded that make that very, very plausible, right? I mean, one, Dr. Jensen was a major political candidate. This was his signature campaign issue. Two, the defendants investigated him over and over and over about this, and they told him in their letters, this is about your TV interviews. This is about your social media posts. And then three, it makes clear the way they wrote these letters that all it took was one person writing in, one member of the public saying, hey, here's, I saw Dr. Jensen on TV. I didn't like what he said. And they would launch an investigation. So in that context, I think those facts make it extremely plausible, extremely likely, really, that a person who had been targeted for an investigation in that way would, when he got up to speak again, think, oh, boy, I got investigated about this last time. How should I phrase it this time to minimize that likelihood? I think this compares extremely favorably, really, to the facts of Twombly and Iqbal themselves. In Twombly, the plaintiff was trying to plead an antitrust conspiracy, and the Supreme Court didn't say you have to plead the exact words that the conspirators spoke or the when and where and how of the agreement. It was, have you pleaded conduct by the defendants that's more consistent with a conspiracy than with, I think the phrase was unchoreographed market activity, right? So here, Dr. Jensen's pleading chill. He's pleaded facts that are vastly more consistent with chilled speech than with any other conclusion. I think that's well more than Twombly requires. I also think, of course, that Judge Strauss, you're completely right about the textual distinction between Rule 8A1 and 8A2. We don't have to meet Twombly. The general jurisdictional allegations under Lujan versus Defenders of Wildlife embrace the specific facts necessary to support them. But if we needed to meet Twombly, we've done it in spades. That's what I have. So if there are no further questions from the court, we would ask that the court reverse the judgment below and then make clear the points on qualified immunity and facial overbreath that I have mentioned. Thank you very much. Thank you.